IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| BECKY ANN SPENCE, | ) | Case No. 13-60029 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| NORMAN ROUSE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary No. 14-6029 |
| | ) | |
| LEWIS RAUCH, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

This adversary proceeding concerns competing claims to the proceeds from a prepetition sheriff's sale of a boat slip which was once owned by Debtor Becky Ann Spence. In addition, the Chapter 7 Trustee asserts that one of the defendants, Sunset Cove Condominium Owners Association, Inc. ("Sunset Cove"), violated the automatic stay for refusing to turn water back on to the Debtor's condominium unit postpetition. The Debtor, *pro se*, also filed a motion to have the water restored to the condominium. For the reasons that follow, the Court finds that Defendant Sunset Cove is entitled to $37,138.30 of the boat slip proceeds, and that the Chapter 7 Trustee is entitled to the remainder. The Court further finds in favor of Sunset Cove on the Trustee's claim for violation of the automatic stay. The Debtor's Motion Requesting that Sunset Cove Restore Water to Unit will be DENIED.

## FACTUAL BACKGROUND

Many of the facts are undisputed.[1]  To summarize, and as discussed in more detail below, the Debtor owns a condominium in Sunset Cove, Stone County, Missouri.  In addition, prior to filing this bankruptcy case, the Debtor owned a boat slip located on Table Rock Lake near the condominium in Sunset Cove.  Prior to the bankruptcy filing, Sunset Cove obtained a judgment against the Debtor for unpaid condo homeowners' assessments and, based on that judgment, it caused the Sheriff of Stone County to sell the boat slip at a sheriff's sale.  Three parties now assert an interest in the proceeds from that sheriff's sale:  Sunset Cove, by virtue of its judgment and execution; Lewis S. Rauch, Carol L. Rauch, D.SC.N., Inc. and Rauch Capital, LLC (collectively, the "Rauches"), by virtue of a Security Agreement and Deed of Trust which the Rauches assert created a consensual lien against both the condo and the boat slip; and the Chapter 7 Trustee, who asserts that neither the sheriff's sale nor the Rauch Deed of Trust is valid.

In addition, as discussed more fully below, the Chapter 7 Trustee asserts that Sunset Cove violated the automatic stay by refusing to return water service to the condo unit, resulting in lost rental income to the bankruptcy estate.  The Debtor also asserts that Sunset Cove violated the stay and asks, among other things, that Sunset Cove be ordered to restore the water to the unit.

### *The Rauches' Asserted Lien Against the Boat Slip*

On April 16, 2007, the Debtor entered into a Promissory Note with Lewis S. Rauch and Carol L. Rauch, Trustees of the Lewis S. Rauch and Carol L. Rauch

---

[1] *See Stipulation by Defendants Lewis S. Rauch, Carol L. Rauch, Lew Rauch, D. SC. N., Inc. and Rauch Capital, LLC's; Sunset Cove Condominium Owners' Association, Inc. and Trustee* (Doc. No. 55).

Revocable Living Trust Agreement dated March 21, 1994 (predecessor-in-interest to the Rauches), for the original principal amount of $497,928. That Note was secured by a Security Agreement wherein the Debtor pledged, as relevant here, a security interest in a condo located at Sunset Cove, Stone County, Missouri (the "Condo"),[2] as well as the Debtor's interest in a 34' x 16' boat slip located in Community Boat Dock Number 4, Sunset Cove, Stall #16, Stone County, Missouri (the "Boat Slip"). That same date, the Debtor executed a Second Deed of Trust against the Condo in favor of the Rauches, "together with the corresponding share of common elements and limited common elements appurtenant thereof." The Rauch Deed of Trust was recorded on November 1, 2007 with the Stone County Recorder of Deeds. No UCC-1 financing statement was filed with regard to this transaction.

The Debtor defaulted on the Note, and the Rauches obtained a judgment in Greene County, Missouri, on October 9, 2012, in the approximate amount of $1.3 million.

### *Sunset Cove's Levy and Sheriff's Sale*

Meanwhile, prior to the entry of the Rauches' Greene County judgment, on July 23, 2012, the Stone County Circuit Court entered judgment in favor of Sunset Cove, and against the Debtor, in the amount of $36,262.25 for unpaid condominium fees on the Condo, with interest at the rate of 9% per annum.

On August 21, 2012, Sunset Cove filed with the Stone County Circuit Court an "Execution/Garnishment/Sequestration Application and Order" (the "Execution

---

[2] The parties all agree that the condo at issue here is known as "Unit 534, Building 5, Final Plat of Building 5 Sunset Cove Condominiums Third Addition," also known as "18 Bradford Place, Unit 534."

Application"), requesting a "general execution" for "other personal property levy." The Instructions for Service on the Execution Application stated, "Levy on boat slip #16 at Dock #4 located at Sunset Cove Condominiums, bearing Corps of Engineers permit #7904 [the Boat Slip]." That same date, on the same form as the Execution Application, the Circuit Court of Stone County issued a Writ of Execution to the sheriff of any county in the State of Missouri directing such sheriff(s) to execute the writ. Hereafter, this form document, containing both the Execution Application and Writ of Execution, is referred to as the "Execution Order."

On September 4, 2012, Stone County Deputy Sheriff Russell Reavis posted a copy of the Execution Order on a pole bearing slip number 16 on the boat dock near the Boat Slip. On the second page of the same Execution Order document, Deputy Reavis filled out the portion certifying that he had posted it at the location, and that the Boat Slip was "currently empty." Both Deputy Reavis and Sheriff Richard Hill testified that their office never made any effort to notify the Debtor of the execution by mail or personal service; rather, it is Sheriff Hill's position that the posting of the Execution Order at the Boat Slip's location constituted notice to the Debtor of the execution and levy.

On September 27, 2012, Sunset Cove's attorney sent three copies of a Notice of Sheriff's Sale to the Sheriff's office for posting in the township where the Boat Slip is located, which is Branson, Missouri. Sheriff Hill filled in and signed the Notice of Sheriff's Sale, scheduling the sale for October 23, 2012, at 1:00 p.m. On October 4, 2012, Sunset Cove's attorney sent the Notice of Sheriff's Sale to the Debtor at her residence at 4339 E. Misty Woods, Springfield, Missouri 65808, as well as to the attorney who represented the Debtor in the state court litigation with Sunset Cove. The Debtor testified that the 4339 E. Misty Woods

address has been her residential address since 2008. However, she testified, she "does not receive mail" at that address and, therefore, she alleges, she did not see the Notice of Sheriff's Sale. The evidence was not clear as to whether, or where, the Sheriff's office posted the Notices of Sheriff's Sale in Branson.

Sheriff Hill sold the Boat Slip to Dr. and Mrs. Jeff Gower on October 23, 2012, for $51,500. That same day, Sheriff Hill executed and tendered a Sheriff's Bill of Sale to the Gowers.

On October 25, 2012, Sunset Cove's attorney sent an accounting to the Sheriff, directing that the proceeds be divided as follows: $37,138.80 to Sunset Cove, and $14,361.12 to the Debtor.

On November 1, 2012, counsel for the Rauches sent a letter to Sunset Cove's attorney making a claim to the proceeds from the sale of the Boat Slip, based on its Deed of Trust. In addition, on November 12, 2012, the Rauches' attorney sent a letter to the Sheriff, advising him of the dispute concerning the proceeds, and requesting that the Sheriff send the $14,361.12 balance of proceeds to Sunset Cove's attorney until the state court could decide who was entitled to them. Based on these requests, the Sheriff sent all of the $51,500 to Sunset Cove's attorney, pending resolution as to who was entitled to the funds. Those funds were held in Sunset Cove's attorney's trust account from that point forward.

### *The Debtor's Bankruptcy Filing and Post-Bankruptcy Litigation*

The Debtor filed a Chapter 11 bankruptcy petition a couple of months after the sale of the Boat Slip, on January 6, 2013. At the time of the bankruptcy filing, in addition to the judgment amount owed to Sunset Cove discussed above, the Debtor owed Sunset Cove additional, post-judgment condo fees in the amount of $8,069.20.

Shortly after filing her bankruptcy petition, on January 24, 2013, the Debtor filed an adversary proceeding challenging the Rauches' Greene County judgment on its Note and Deed of Trust, which the parties ultimately settled.  As relevant here, the settlement in that proceeding provided:

> Debtor and the Rauch Trust shall pursue any claims jointly with respect to the Boat [Slip] with the understanding that any attorney fees would be paid first from any recovery and the resulting net proceeds divided in half between the Debtor and the Rauch Trust. If the Boat [Slip] were recovered in kind, then the parties would be joint owners with the Debtor given a right to purchase any rights of the Rauch Trust for one-half of the fair market value thereof. . . .

As further part of the stipulation, the Debtor and the Rauches agreed that if the Rauches were perfected in the Boat Slip, they were perfected pursuant to the filing of the Second Deed of Deed of Trust mentioned above.  The Rauches agreed to execute a partial release of the Deed of Trust as to the Condo only (to be held in escrow), but the parties agreed that the Deed of Trust would remain on file as to the Boat Slip.

On May 9, 2014, the Debtor's bankruptcy case was converted to Chapter 7, and the Chapter 7 Trustee was appointed.  On September 26, 2014, the Trustee filed this adversary proceeding against the Rauches, Sunset Cove, and Sunset Cove's attorney, seeking a determination as to who is entitled to the proceeds from the sale of the Boat Slip.  The parties have filed cross- and counter-claims, each asserting a right in some or all of the proceeds.

### *The Water Supply to the Condo*

Prior to the bankruptcy filing (in fact, prior to Sunset Cove's Stone County judgment being entered in July 2012), on January 12, 2010, Sunset Cove had turned off the water to the Condo due to a burst pipe in the unit.  Sunset Cove

6

never restored water to the unit after the pipe was repaired, apparently because the Debtor was delinquent in condo dues.   Indeed, at one point, Sunset Cove's maintenance and repair supervisor observed a straight pipe which had been placed across the water meter, bypassing the meter.  In addition, the lock that had been placed on the meter had been removed and water was being used by the unit.  At that point, Sunset Cove modified the plumbing in a more significant manner so as to prevent further unauthorized use of water by the unit.   After the bankruptcy filing, and as discussed more fully below, the Debtor made demands to have the water turned back on.  However, Sunset Cove has refused to do so.

The Trustee asserts that Sunset Cove's refusal to turn the water back on after the Debtor demanded that it do so violated the automatic stay.  He asserts that the Debtor, and then the estate, lost rental income as a result of such refusal.  The Debtor also asserts that Sunset Cove violated the stay, and asks that Sunset Cove be ordered to restore water to the unit.

## DISCUSSION

### *The Boat Slip Proceeds*

At the conclusion of the trial in this matter, this Court directed the parties to brief the threshold question of whether the Boat Slip is real or personal property. This question is critical because if the Boat Slip is real property, and if the Rauch Deed of Trust properly perfected a lien against it, then the Rauches are entitled to all of the proceeds.[3]  Further, if it is real property, then regardless of whether the Rauch lien was perfected, Sunset Cove's levy was ineffective because it followed the procedures for a levy of personal property, not real property.  Therefore, if the

---

[3] Perhaps subject to the 50/50 split with the Debtor pursuant to the settlement in the adversary proceeding by the Debtor against the Rauches mentioned above.

Boat Slip is real property, *and* if the Rauch Deed of Trust did not perfect a lien against it, then the Trustee is entitled to all of the proceeds.

If, on the other hand, the Boat Slip is personal property, then the Rauches concede they have no UCC-1 financing statement on file and, therefore, they do not have a perfected lien in it or its proceeds. In that case, then the question is whether Sunset Cove properly levied against it through its sheriff's sale. If it did, then it is entitled to $37,138.30 of the proceeds, and the Trustee is entitled to the remaining $14,361.12. Finally, if the Boat Slip is personal property, *and* if the sheriff's sale was defective, then the Trustee is once more entitled to all of the proceeds.

### The Rauches' Security Interest in the Boat Slip

The Debtor purchased the Boat Slip on July 31, 1996, from Sunset Cove, LTD (a distinct entity from Defendant Sunset Cove Condominium Owners Association) and one Dennis Sheppard (apparently, Sunset Cove, LTD's secretary), by virtue of a Sunset Cove Contract for Sale of Stall in Community Boat Dock Number Four (4) (the "Contract for Sale"). Under the terms of the Contract for Sale, Sunset Cove, LTD sold to the Debtor "[a]n undivided one-twentieth (1/20th) interest in Sunset Cove Community Boat Dock Number Four (4)," particularly, "Stall Number 16."

At the outset, the Contract for Sale expressly prohibited the Debtor from "assign[ing], transfer[ring], sell[ing], or otherwise encumber[ing]" her interest in the boat dock to anyone who was not the owner of a condominium unit or lot in the Sunset Cove project at the time. There was no evidence that the Rauches were ever owners of a condominium unit or lot there, and so the validity of the Rauches' lien against the Boat Slip is questionable from the start.

8

But assuming that the lien itself is valid, the question is whether it is properly perfected. The parties agree that neither the Boat Slip, nor the boat dock on which it is located, has a legal description of its own. Rather, the Rauches assert that the Debtor's interest in the Boat Slip was in the nature of an easement or fixture and, therefore, real property. Both the Trustee and Sunset Cove assert that such interest is personal property.

I conclude that the Boat Slip is personal property for two primary reasons: First, the Boat Slip does not have a legal description, nor is it sufficiently tied to real property owned by the Debtor such that liens against it can be recorded with the Stone County Recorder of Deeds; and second, it is taxed by Stone County as personal property. More specifically:

Community Boat Dock Number Four is attached to the shoreline at Table Rock Lake, which is owned by the United States Army Corp of Engineers. The Contract for Sale indicates that, at the time of its execution, Community Boat Dock Number Four had not yet been built and was subject to the requisite approvals for its construction and location by the Corps of Engineers. One can assume that Sunset Cove, LTD subsequently obtained the requisite approvals from the Corps of Engineers, and thus, built Community Boat Dock Number Four at its current location.

In *Meeker v. Grissum*, the Missouri Court of Appeals described the process for ownership in a boat slip on a community boat dock attached to land owned by the Corps of Engineers at Table Rock Lake, such as the one here:

> The United States Army Corps of Engineers (Corps) has promulgated a shoreline management plan for Table Rock Lake. . . . The Corps issues permits for community docks in this lake. Each dock permit must list a "person designated in an association agreement, or similar document, as the authorized representative for the slip owners in the dock." Moreover, each individual who owns a boat slip or stall in a

9

particular dock must supply evidence of his or her ownership to the "authorized representative." If the alleged owner's evidence meets the Corps' requirements, the dock representative informs the Corps of the new ownership. Thereon, the Corps puts the new owner on its list of boat slip ownership.[4]

At trial, the Trustee described the situation with Community Boat Dock Number Four at Sunset Cove, and his description was the same or similar to the description provided in *Meeker v. Grissum*: According to the Trustee, Sunset Cove, LTD owns Community Boat Dock Number Four which is attached to Corps property, and one Steve Ownby is the authorized representative of the slip owners. Every five years, the dock must be re-permitted by the Corps of Engineers, and in connection with that re-permitting, Mr. Ownby provides the Corps with a list of the slip owners, which would have included the Debtor during the period of time she owned it. No party has disagreed with the Trustee's representation as to how that process works in this situation.

"No statute or regulation requires the Corps to authorize private use of publicly owned shorelines. Shoreline use permits 'do [ ]not convey any real estate or personal property rights or exclusive use rights to the permit holder,' . . . and the Corps has broad discretion to manage and regulate water resources and to revoke permits as the public interest requires."[5] Thus, at any point, the Corps of Engineers could decide, in its own discretion, not to re-permit Community Boat Dock Number Four, at which point, it would presumably have to be removed.

---

[4] *Meeker v. Grissum*, 970 S.W.2d 345, 346 (Mo. Ct. App. 1998).

[5] *McClung v. Paul*, 788 F.3d 822, 829-30 (8th Cir. 2015) (citing 36 C.F.R. 327.30(d)(5); 16 U.S.C. § 460d; 36 C.F.R. 327.30 app. A(3)) (holding that dock owners did not have due process rights concerning their dock permit because the statutes and regulations applicable to shoreline use permits do not create a protectable property interest).

Although the Debtor's ownership in the Boat Slip is by virtue of Sunset Cove, LTD's permit, and the Eighth Circuit has said that such permits do not convey any real or personal property rights to the permit holder, the Rauches nevertheless assert that the Debtor's interest in the Boat Slip was in the nature of an easement or fixture and, therefore, should be treated as real property.

As the Rauches assert, an easement entitles its owner to a limited use or enjoyment of the land of another.[6]  No particular form and language are necessary to create an easement, rather, any words clearly showing the intention of the parties to create a servitude on a sufficiently identifiable estate is sufficient to create an easement.[7]

The Rauches cite three cases in support of their argument that the Boat Slip is an easement.  In *Gowen v. Cote*,[8] the Missouri Court of Appeals held that a right of adjacent lot owners to use a boat ramp to a river through the landowners' restrictive covenant was a form of easement.   However, a boat ramp is distinguishable from a boat dock because a ramp is actually on the land.

The Rauches also rely on *Hellman v. Sparks*,[9] and *Blackburn v. Habitat Dev. Co.*,[10] which both indicate that easements or licenses might be granted through restrictive covenants for using, constructing, and maintaining boat docks at the Lake of the Ozarks.  However, in each of those cases, as well as *Gowen v. Cote*, the purported easement was alleged to have been given by the actual landowner on which the dock was to be located.  In contrast, Community Boat Dock Number Four is located on land owned by the Corps of Engineers.  Although it may well be

---

[6] *Blackburn v. Habitat Dev. Co.*, 57 S.W.3d 378, 385 (Mo. Ct. App. 2001).

[7] *Id.*

[8] 875 S.W.2d 637 (Mo. Ct. App. 1994).

[9] 2015 WL 1021307 (Mo. Ct. App. March 6, 2015) (unpublished).

[10] 57 S.W.3d 378 (Mo. Ct. App. 2001).

that the shoreline at the Lake of the Ozarks is also owned by the Corps, none of the cases cited by the Rauches discuss the consequences of the dock being located on Corps property by virtue of a permit granted to the adjacent landowner.  Further, none of those cases dealt with the perfection of a lien on such docks; rather, they all involved disputes among various landowners as to access to the docks.

In any event, to the extent that Missouri courts have held that permission to construct and use a boat dock may be granted through an easement or license, the problem with the Rauches' argument is that an easement must be given on "a sufficiently identifiable estate," namely, a particular parcel of property owned by someone other than the owner of the easement.  To the extent that Community Boat Dock Number Four (and by extension, the Boat Slip) is attached to real property, it is attached to property owned by the government, not by Sunset Cove or Sunset Cove, LTD, and certainly not by the Debtor.

The Rauches' fixture argument has the same fatal flaw.  As the Rauches state, a fixture is a piece of personal property that has become so affixed to real estate that it loses its identity as separate property and becomes part of the real estate.[11]  Missouri also accepts the notion of constructive annexation whereby a particular article, although not permanently attached to the land, may be so adapted to the use to which the land is put that it may be considered an integral part of the land.[12]

For the same reasons discussed above concerning easements, even if Community Boat Dock Number Four could be viewed as a fixture by virtue of its

---

[11] *See In re AmerEco Environmental Servs., Inc.*, 138 B.R. 590, 593 (Bankr. W.D. Mo. 1992).

[12] *See Mouser v. Caterpillar, Inc.*, 336 F.3d 656, 663 (8th Cir. 2003).

attachment or adaptation, it is a fixture on land owned by the Corps of Engineers, not the Debtor.

As stated above, the Rauches agree that boat docks and boat slips do not have legal descriptions.  And because purchasers of boat slips at Community Boat Dock Number Four purchase them separately from their particular condos, there is nothing in the real estate records which would alert someone that the owner of the Debtor's condo unit also owned Stall Number 16.   Therefore, boat slips at Community Boat Dock Number Four cannot be easements or fixtures connected to particular condo units.  The Debtor's Boat Slip is, therefore, personal property.

Bolstering this conclusion, the Debtor testified that she was required to list the Boat Slip, along with her boat, as taxable personal property with the Stone County Collector, and that she paid personal property taxes on it.  This testimony was supported by a Stone County Personal Property Tax Statement for 2008, which lists a boat slip as part of the property being taxed.

For these reasons, I conclude that the Boat Slip is personal, not real, property.

Finally, even assuming for the sake of argument that the Boat Slip were an easement or fixture (such that it is real property), the Rauch Deed of Trust does not adequately perfect a lien in it as part of the real property.  First, the Rauches did not do a fixture filing pursuant to § 400.9-502 of the Missouri Statutes.

Further, the Rauch Deed of Trust contains only the description of the Debtor's Condo unit:

UNIT 534, BUILDING 5, FINAL PLAT OF BUILDING 5 SUNSET COVE CONDOMINIUMS THIRD ADDITION, AS PER THE RECORDED PLAT THEREOF, AND ACCORDING TO THE DECLARATION OF CONDOMINIUMS IN BOOK 251, PAGE 107, RECORDERS OFFICE, STONE COUNTY, MISSOURI, TOGETHER WITH THE CORRESPONDING SHARE OF

13

COMMON ELEMENTS AND LIMITED COMMON ELEMENTS APPURTENANT THEREOF.

As the Rauches point out, the Declaration of Condominiums referenced in this description provides that "common elements" include boat docks and boat storage buildings, and that the Declaration's terms, covenants, conditions, easements, restrictions, uses, reservations, limitations "shall be deemed to run with the land." It also provides that each owner of a condo unit shall be seized of fee simple title to and exclusive ownership and possession of his/her condo unit and of the fee simple title in an undivided interest in the common areas and facilities.

However, despite the fact that the pledged property (the Condo) included all of the associated easements and other rights to the common areas, including access to the boat dock, as discussed above, the Debtor purchased her interest in the Boat Slip separately from her Condo. Her ownership interest in the particular Boat Slip is something more than just her general rights as a condo unit owner to the use of the common elements. So, once again, even assuming that the Boat Slip is real property as a fixture or easement, someone looking at the real property records would have no idea that the Rauch Deed of Trust covers it.

As a result, I find that the Rauch Deed of Trust did not create a perfected lien in the Boat Slip and, therefore, the Rauches are entitled to none of the proceeds.

<u>The Validity of Sunset Cove's Execution and Levy of the Boat Slip</u>

Having concluded that the Boat Slip is personal property, the next issue is whether Sunset Cove properly executed and levied against the Boat Slip on its Stone County judgment. If it did not, then the Trustee asserts, *inter alia*, that the

14

sheriff's sale was a preference because the sale occurred within 90 days prepetition.[13]

> The term "execution" refers to the process by which a judgment creditor is able to reach non-exempt assets of the debtor for the purpose of satisfying the judgment.  It may also be used to refer to the writ of execution, or fieri facias (fi.fa.), that is used by the court clerk upon request of the judgment creditor and which commands the sheriff to levy upon the property of the debtor.[14]

"An execution may be issued on application signed by the party or his attorney and stating the address of the person making the application."[15]   Once the judgment creditor makes such an application for execution to the Clerk of the Court, the Clerk issues a Writ of Execution to the sheriff, directing the sheriff to execute the writ by levying upon the debtor's property, and to certify to the court how he or she did so.  A levy is "the actual seizure of property by the officer charged with the execution of the writ."[16]

As applicable here, "[a] levy upon tangible personal property where seizure is impracticable shall be made by the sheriff posting a notice of levy upon the property or as near as practicable thereto."[17]   Once the sheriff has levied the personal property, he or she then tenders to the Clerk a Sheriff's Return stating how he or she levied upon the property.  "A levy creates a lien upon personal property."[18]

---

[13] 11 U.S.C. § 547(b)(1).

[14] William H. Henning, *Missouri Executions on Money Judgments* at § 1-1 (The Harrison Co., 1984)).  *See also* Mo. Rev. Stat. § 513.015 ("The party in whose favor any judgment, order or decree is rendered, may have an execution in conformity therewith.").

[15] Mo. R. Civ. P. 76.01.

[16] Mo. Rev. Stat. § 513.010.1.

[17] Mo. R. Civ. P. 76.06(c).

[18] Mo. R. Civ. P. 76.07.

Regarding notice of an execution and levy, the Rules provide:

Within three days after an officer has levied an execution, the officer shall notify the person against whom the execution has issued that an execution has been levied, that certain property, if any, is exempt under sections 513.430 and 513.440, RSMo, and that the person has the right to hold the property as exempt from attachment and execution. The officer shall also generally state that there are certain exemptions under state and federal law that the judgment debtor may be able to claim with respect to the property levied upon and describe the procedure for claiming the property as exempt. The notice shall also inform the person against whom the execution issues of the manner in which the person may obtain a specific description of the property upon which the levy was made. *The notice may be served in the same manner as a summons or by mailing the notice to the judgment debtor at the debtor's last known address by regular mail.* Service by mail shall be complete upon mailing.[19]

This notice to the debtor triggers certain rights of the debtor to, for example, claim exemptions or elect which property is to be levied.[20]

In addition, with certain exceptions not applicable here, "[b]efore selling personal property under an execution, the sheriff, at least ten days before the sale, shall post three notices in public places in the township in which the sale is to be held. The notices shall describe the property to be sold, shall state the time and place of sale, and shall state the methods of payment approved by the judgment creditor."[21] "Rule 76.13 simply provides for public notice of the execution sale of a judgment debtor's personal property . . . However, the rule does not require

---

[19] Mo. R. Civ. P. 76.075(a) (emphasis added). *See also* Mo. Rev. Stat. § 513.445 (requiring similar three-day notice on any execution).

[20] *See, e.g.*, Mo. R. Civ. P. 76.075(b) and 76.09.

[21] Mo. R. Civ. P. 76.13.

16

notice of sale to the judgment debtor, in contrast to Rules 76.16 and 76.17 involving real property that requires personal or mail service on the owner."[22]

Thus, with regard to personal property, Rules 76.075(a) and 76.13 require that the debtor be notified, by mail or personal service, of the *execution and levy*, but only public notice of the *actual sale* is required.

After posting the public notice of the sale, the sheriff then conducts the sale in accordance with the notice, issues a bill of sale, and disburses the proceeds.

Here, the Application for Execution from Sunset Cove's attorney to the Stone County Clerk of Court; the Clerk's Writ of Execution to the Sheriff; and the Sheriff's Return were all on one combined form.  That form also contained the notice of exemptions and other notices required by Rule 76.075(a).[23]  As stated above, the Sheriff's Deputy testified that he posted this filled-in document on the pole next to the Boat Slip.  It is the Sheriff's position that this posting constituted both the levy of the Boat Slip and notice to the Debtor of execution.

The Chapter 7 Trustee asserts first that the form is confusing because it refers to garnishment, and this was an execution of personal property, not a garnishment.  Although the Sheriff did mistakenly fill in some information in the garnishment portion of the document, Sunset Cove's attorney had checked the boxes for "general execution" and "other personal property levy," not the boxes for "garnishment," "bank account," or "wages."   Nor is a garnishee identified.  Further, the instructions clearly direct the Sheriff to levy on the particular Boat Slip, which the Sheriff indicated on the form that he did.  The Trustee also asserts that the form is confusing because it does not use the words "notice of levy."

---

[22] 16 Mo. Prac., Civil Rules Practice § 76.13-1 (2015 ed.).

[23] *See In re Jackson*, 260 B.R. 473, 481 (Bankr. E.D. Mo. 2001) ("In many Missouri counties, the notice [of exemptions] is usually printed on the reverse side of other documents that are served on a debtor.").

17

While the form as filled out may not be the model of clarity, I find that a person seeing this document posted at the Boat Slip would understand that the Boat Slip has been levied and will be sold by the Sheriff. Therefore, I find that the posting this document next to the Boat Slip complied with Rule 76.06(c).

However, the Trustee is correct that the Debtor did not receive the notice required by Rule 76.075(a). As the Trustee asserts, Rule 76.075(a) expressly requires that "within three days after an officer has levied an execution," the officer shall notify the debtor that the property has been levied, and such notice "may be served in the same manner as a summons or by mailing the notice to the judgment debtor at the debtor's last known address by regular mail." There is nothing in the rule which permits notice to the debtor by posting alone. Indeed, at least one authority on the subject has said, "[i]n order to prevent an order quashing the execution or damages for wrongful execution, it is imperative for a judgment creditor to verify that the sheriff has either personally served the judgment debtor with the notice of exemptions or has mailed them to the judgment debtor's last known address."[24]

Sunset Cove asserts that the Sheriff's Bill of Sale contains a recital that "prior notice of the sale was given 'as the law directs,'" and that the recitals in a Sheriff's deed are conclusive as to the regularity of the sale in the absence of any showings to the contrary.[25] Sunset Cove asserts notice to the Debtor was therefore proper.

Sunset Cove is incorrect in two respects. First, the Bill of Sale provides only that the Sheriff gave ten days notice of the time and place of *sale* – meaning the public notice required under Rule 76.13 – the Bill of Sale makes no mention of any

---

[24] 16 Mo. Prac., Civil Rules Practice § 76.075-1 (2015 ed.).

[25] *Citing Thorp v. Daniel*, 99 S.W.2d 42, 45 (Mo. 1936).

notice of *execution* given to the Debtor.   More importantly, the Stone County Sheriff expressly testified that he did not mail or serve a notice of execution or levy to the Debtor and that he generally does not do so; rather, he considers the posting of the document at the site to constitute notice to a debtor.   As discussed above, this is simply incorrect.   And, even though it was the Sheriff's responsibility to provide the Debtor notice by personal service or mail,[26] Sunset Cove's attorney did not send notice to the Debtor, either.   Sunset Cove's attorney did mail the Notice of Sheriff's Sale a month after the levy occurred, but this is not the equivalent of mailing the notice of levy.   Among other things, the Notice of Sheriff's Sale does not contain the required exemptions warnings and the timing of the notice was wrong.   The Trustee has, therefore, proven that Sunset Cove did not comply with the notice requirements in Rule 76.075(a).

However, in *Rusk v. Rusk*, the Missouri Court of Appeals held that the failure of the levying officer to notify the judgment debtor of his exemption rights pursuant to Rule 76.075(a) was not grounds for quashing a writ of garnishment because the debtor had not shown any prejudice resulting from his failure to receive notice, namely by showing that the garnished funds were exempt.[27]   In

---

[26] *Rusk v. Rusk*, 859 S.W.2d 751, 754 (Mo. Ct. App. 1993) ("[T]he officer who executes the levy is the person required to give notice, not . . . the creditor."). *See also In re Jackson*, 260 B.R. at 481 ("[I]t is the responsibility of the officer serving the writ and summons on the garnishee to give notice to the debtor of his right to claim certain exemptions. . . . .   The duty to give such notice lies with the officer who executes the levy, and not with the creditor. . . .   If such notice is not given, the remedy is not to quash the garnishment.   Rather a debtor may have an action to recover the amount of the exemption the debtor was unable to claim from the party whose legal responsibility it was to give the notice.").

[27] 859 S.W.2d 751, 754 (Mo. Ct. App. 1993). *See also Heinz v. Woodson*, 758 S.W.2d 452, 454 (Mo. 1988) (holding, in the context of a real property execution, that "[b]efore setting aside an execution sale for noncompliance with procedural requirements, we must determine (1) whether the noncompliance undermines the purpose of the rule, and (2) whether the complaining party was prejudiced by the noncompliance."); 16 Mo. Prac., Civil Rules Practice § 76.075-1 (2015 ed.) ("With respect to subsection (a), the levying officer's failure to give notice of the exemption rights may not invalidate the writ of execution or garnishment," noting, however, that

keeping with the principle that prejudice is required, and because it is the sheriff's duty to provide the notice to the debtor, the remedy for failure to do so is often not to quash the execution, but to file an action to recover the amount of the lost exemption against the sheriff (or his bond).[28]

> The duty of the officer to notify the judgment debtor of his exemption rights is mandatory, and failure to advise of those rights will require a levy to be quashed when the levy has been made upon property that could be held as exempt.  [*Smith v. Waterson*, 34 S.W.2d544 (Mo. App. 1931)].  However, the sheriff's failure to apprise the judgment debtor of the exemption rights will not invalidate an execution sale of property, [*Daugherty v. Gangloff*, 239 Mo. 649, 144 S.W. 434 (1911)], although the sheriff may be liable on his bond for breach of the mandatory duty. [*Dancer v. Chenault*, 527 S.W.2d 714 (Mo. App. 1975)].[29]

Here, the Trustee has shown no prejudice to the estate resulting from the lack of notice to the Debtor, nor has the Debtor claimed she is entitled to an exemption in the proceeds.  Further, the sale produced proceeds in excess of Sunset Cove's judgment amount which must be turned over to the estate; therefore, if the Debtor were to claim an exemption in the proceeds, such claim would be made against the estate's portion of the proceeds, and could be made by amending her exemption schedule prior to the closing of the bankruptcy case.[30]

---

the *Rusk* court's ruling is likely limited to cases where the judgment debtor fails to show entitlement to any exemptions).

[28] *See In re Jackson*, 260 B.R. at 481 ("If such notice is not given, the remedy is not to quash the garnishment.  Rather a debtor may have an action to recover the amount of the exemption the debtor was unable to claim from the party whose legal responsibility it was to give the notice.") (citing *Dancer v. Chenault*, 527 S.W.2d 714, 717 (Mo. Ct. App. 1975)).  *But see Smith v. Waterson*, 34 S.W.2d 544 (Mo. Ct. App. 1931) (holding that an execution should have been quashed for failure to advise of exemptions).

[29] 2 Mo. Prac., Methods of Prac.: Litigation Guide § 23.19 (4th ed.).

[30] *See* Fed. R. Bankr. P. 1009(a).

20

As to the apparent failure to post three notices in public places in the township, once again no prejudice was shown.  The Debtor testified, and the Contract for Sale of the Boat Slip provides, that only condominium unit owners may have access to the boat dock and, further, only condominium owners may own boat slips there.  Since only persons owning Sunset Cove condo units may own boat slips there, no purpose would have been served by posting a notice anywhere other than at the location.  And, as stated, the sale process brought a price well in excess of the debt, which is strong evidence that there was competitive bidding at the sale.  As a result, no prejudice has been shown from any failure to post additional notices.

Based on the foregoing, I find that Sunset Cove's execution and levy against the Boat Slip were valid.  Since the levy which created the lien occurred more than 90 days prepetition, the levy was not a preference, and Sunset Cove is thus entitled to $37,138.30 of the proceeds.  The Trustee is entitled to the remainder.

### *Violation of the Automatic Stay*

Prior to the bankruptcy filing, in January 2010, Sunset Cove turned off the water to the Debtor's Condo due to a significant water leak in the unit.  After the leak was fixed, however, Sunset Cove refused to turn the water back on, apparently because the Debtor was delinquent with her bill for condo assessments.  In March 2014, Sunset Cove's maintenance supervisor discovered that someone was bypassing the shut-off, such that water was restored to the unit on weekends when he was not there, and so he made a more substantial modification to the plumbing to prevent further unauthorized use of water by the unit.

Meanwhile, the Debtor filed this bankruptcy case (then a Chapter 11) on January 6, 2013. The Debtor says that she and her then-attorney requested, post-petition, that the water be turned back on, but that Sunset Cove refused.

The Trustee asserts that Sunset Cove's refusal to turn the water back on after the bankruptcy filing violated the automatic stay. Section 362(a)(6) provides that the filing of a bankruptcy petition operates as a stay, applicable to all entities, of "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case."[31]

However, although a creditor cannot take any act to collect a prepetition claim against a bankruptcy debtor, most creditors do not have an affirmative obligation to continue providing postpetition services to a debtor, either.

There is one relevant exception to this general proposition. Section 366(a) of the Bankruptcy Code provides:

> Except as provided in subsections (b) and (c) of this section, a utility may not alter, refuse, or discontinue service to, or discriminate against, the trustee or the debtor solely on the basis of the commencement of a case under this title or that a debt owed by the debtor to such utility for service rendered before the order for relief was not paid when due.[32]

Both Sunset Cove and the Trustee agree that for these purposes, Sunset Cove should be considered to be a utility, because water is a necessity and the condos there cannot get it except through Sunset Cove. I also agree that at least a portion of the services provided by Sunset Cove are those of a utility for purposes of § 366.[33]

---

[31] 11 U.S.C. § 362(a)(6).

[32] 11 U.S.C. § 366(a).

[33] *See In re Moorefield*, 218 B.R. 795, 796 (Bankr. M.D. N.C. 1997) (holding that the Bankruptcy Code does not define "utility," but the legislative history indicates that § 366 was

Nevertheless, to the extent Sunset Cove was acting as a utility, it was not required to restore the water to the Condo unless the Debtor complied with § 366(b), which provides:

> Such utility may alter, refuse, or discontinue service if neither the trustee nor the debtor, within 20 days after the date of the order for relief, furnishes adequate assurance of payment, in the form of a deposit or other security, for service after such date.  On request of a party in interest and after notice and a hearing, the court may order reasonable modification of the amount of the deposit or other security necessary to provide adequate assurance of payment.[34]

"Assurance of payment" means (i) a cash deposit; (ii) a letter of credit; (iii) a certificate of deposit; (iv) a surety bond; (v) a prepayment of utility consumption; or (vi) another form of security that is mutually agreed on between the utility and the debtor or the trustee.[35]  In addition, in a Chapter 11 case (which this case was when the Debtor filed it), a utility may alter, refuse, or discontinue utility service if the utility has not *received* from the debtor or trustee the adequate assurance of payment within 30 days after the filing of the petition.[36]

Therefore, to the extent Sunset Cove is a utility for purposes of § 366, in order for it to have been required to restore water to the Condo, the Debtor was required to offer adequate assurance within 20 days postpetition, and to actually furnish such adequate assurance within 30 days postpetition.

---

intended to cover such services as water, electricity, gas, and phones, which are typically regarded as necessary to meet minimum standards of living; "utilities covered under § 366 are not limited to public utilities, and other entities acting as utilities are also eligible"); *In re Good Time Charlie's Ltd.*, 25 B.R. 226 (Bankr. E.D. Pa. 1982) (holding that shopping mall which supplied electricity to debtor was a "utility" under § 366).

[34] 11 U.S.C. § 366(b).

[35] 11 U.S.C. § 366(c)(1)(A).

[36] 11 U.S.C. § 366(c)(2).

The only evidence at trial concerning requests for restoration of the water was a few scattered emails between the Debtor; her attorney, Ms. Krigel; Kathy Breen, Sunset Cove's "Association Manager"; and Christy Wittmaier, a paralegal for Sunset Cove's attorney.[37]   The earliest such email is dated August 7, 2013, some seven months after the bankruptcy filing.

As a result, there was no evidence presented at trial that either of the two conditions under § 366 occurred within the required timeframes.   Further, the Debtor did not file any pleading with this Court requesting enforcement of § 366(a).

Rather, the Trustee points out that Nicolaus Neumann, the president and a board member of Sunset Cove, testified that, despite the Debtor's demands to have the water turned back on, Sunset Cove refused to do so until the Debtor brought her bill for assessments current by paying the entire balance owed at the time of the request.   As the Trustee alleges, the monthly bill for condo assessments was $365 for each unit, which included $205 for common area expenses, and $160 for water, sewer, trash, and cable television services.   The water is supplied by Stone County in bulk to Sunset Cove, which then supplies water to each unit.   Sunset Cove does not break down or monitor the water usage per condo unit.

The Trustee asserts that, rather than demanding payment of the bill in full (including fees entirely unrelated to water) Sunset Cove should have broken down the total assessment into a reasonable figure representing the water bill and that that number should have been the basis for an adequate assurance offer.

I agree with the Trustee that Sunset Cove was not entitled to payment in full before restoring the water; rather, it was entitled only to adequate assurance relating to the water portion of the assessment, and Sunset Cove could have come

---

[37] *See* Sunset Cove's Exhibits 3, 5, 6, 10, and 11.

24

up with a number reasonably representing the water portion. But again, the only evidence offered at trial was that the first communication concerning restoration of the water was in August 2013, seven months after the January 6, 2013 filing date.

The Trustee points out that Sunset Cove's attorney was holding the $14,000 in excess proceeds at the time of filing, and that those funds could have been applied to past due obligations. Not so, for two reasons: First, the Rauches had made a claim to all the boat slip proceeds by virtue of their Deed of Trust, and so Sunset Cove could have been exposed to liability if it had either returned those funds to the Debtor or applied them to post-judgment delinquency; and second, there was no evidence that the Debtor offered those funds to Sunset Cove as adequate assurance within 20 days after the bankruptcy filing in any event.

Finally, even if the Debtor had made an adequate assurance offer relating to the water, and even if the water had been restored, the Trustee does not cite any authority for the proposition that Sunset Cove would then have been required to restore all of the other non-utility amenities, such as cable television and access to the common areas and dock. The evidence showing that the Debtor (and then the estate) could have rented the Condo naturally assumes that such a tenant would have access to the condo amenities. There is no evidence that the Debtor offered to pay the monthly charges to restore those other services, apart from the water. Since a renter would not have had access to the other services, the Trustee's evidence of damages is of little persuasive weight. Therefore, the Trustee has failed to demonstrate that, even if Sunset Cove had violated the stay by refusing to accept an adequate assurance offer relating to the water, the estate suffered damages as a result.

The Trustee's action against Sunset Cove for violation of the automatic stay will, therefore, be denied.

25

### *The Debtor's Motion to Require Sunset Cove to Restore Water*

On January 16, 2015, the Debtor filed a *pro se* Motion Requesting Sunset Cove HOA to Restore Water to Unit and Grant Damages (the "Motion to Restore Water"). The Court struck that motion because the Debtor was still being represented by Ms. Krigel at the time. A few days later, on January 22, 2015, Ms. Krigel filed a Motion to Withdraw as counsel for the Debtor. Following a hearing, at which the Debtor consented to such withdrawal, this Court granted the Motion to Withdraw. Thereafter, on February 12, 2015, the Debtor, *pro se*, re-filed her Motion to Restore Water.

By that point, however, the Debtor's standing to assert such a motion had been raised, in light of the fact that the case had been converted to Chapter 7, any recovery would belong to the estate, and it was (and remains) quite clear that the estate was not solvent.[38] Indeed, one of the reasons stated by Debtor's counsel for withdrawing at the hearing on February 2, 2015, was that the Debtor wanted her to file pleadings requesting relief for which counsel believed she had no standing. Thus, at the hearing on counsel's Motion to Withdraw, the Trustee stated he would investigate the claims concerning the water at the Condo. Shortly thereafter, on March 13, 2015, the Trustee amended his Complaint in this Adversary Proceeding to include the count alleging that Sunset Cove violated the stay by refusing to restore the water, discussed above. Nevertheless, despite the standing issue, I did

---

[38] *See, e.g., In re Peoples*, 764 F.3d 817, 820 (8th Cir. 2014) ("Standing in a bankruptcy appeal is narrower than Article III Standing. . . . The [person aggrieved] doctrine limits standing 'to persons with a financial stake in the bankruptcy court's order,' meaning they were 'directly and adversely affected pecuniarily by the order.'"; Unless a debtor can show a reasonable possibility of a surplus after satisfying all debts, then the debtor has not shown a pecuniary interest and standing with regard to property of the bankruptcy estate).

not strike or deny the Debtor's re-filed Motion to Restore Water based on standing, primarily because no party asked that the Motion be stricken or denied.

Although I still question the Debtor's standing to bring her Motion, and have concluded that Sunset Cove did not violate the stay in any event, discussed above, some points in the Debtor's Motion and post-trial brief merit brief discussion.

First, the Debtor asserts in her Motion that, on March 13, 2014, her attorney approached Sunset Cove's attorney at the courthouse prior to a court hearing and reached a settlement which required Sunset Cove to pay half of the $14,361.12 surplus, or $7,180.56, to the Debtor's attorney for her fees, and to apply the remaining $7,180.56 to the outstanding condo assessments.

However, no motion to approve such a settlement was filed with, or approved by, the Court. Any purported agreement between the attorneys is, therefore, unenforceable and, in any event, irrelevant to the question of whether Sunset Cove violated the stay by refusing to turn the water back on.

The Debtor next asserts that, had the water been restored, she could have rented the unit for a minimum of $1,100 per month (plus the ongoing condo fees), as the Trustee argued above, and that her Chapter 11 case might not have been converted to Chapter 7 if she had had that rental income.

The argument that the case would not have been converted but for the water arguably gives the Debtor standing here. However, her assertion is incorrect for at least three reasons. First, insufficient cash flow was only one of several reasons why I denied confirmation of the Debtor's proposed Chapter 11 Plan,[39] which was the catalyst to the United States Trustee and Wells Fargo moving to dismiss or

---

[39] Those reasons included, among other things: The Debtor was proposing to cram down eight of Wells Fargo's secured claims to a value significantly below what Wells Fargo would receive in a Chapter 7 case in violation of § 1129(a)(7) and, as in a prior Chapter 11 case filed by the Debtor, her Plan hinged on highly speculative events occurring in the future. Further, she had made no payments, except to two creditors, under the prior case's confirmed plan.

convert.  Second, as discussed above, such a rental rate presumes that all condo privileges be restored, not just the water, and neither the Debtor, nor the Trustee, has cited any authority for the proposition that Sunset Cove was affirmatively required to restore the non-utility amenities. Finally, given the history of this and the Debtor's prior Chapter 11 case, it is extremely unlikely that this income would have changed things, and there was no evidence presented showing that it would. Simply put, I find that the conversion of this case had little, if anything, to do with the lack of rental income from the Condo.

Finally, the Debtor raises a couple of issues for the first time in her post-trial brief, including a violation of "Rules of Department of Economic Development Division"; that Sunset Cove has not removed liens it filed against the Condo for unpaid condo fees; and that she could have sold the Boat Slip for over $80,000. Even if these arguments were relevant to the question of whether Sunset Cove violated the stay, which I find they are not, there was no evidence as to any of these arguments at trial.

## CONCLUSION

Based on the foregoing, the Court will enter judgment as follows:

On Count I of the Trustee's Amended Complaint (Doc. No. 23) for turnover pursuant to 11 U.S.C. § 542, Judgment will be entered in favor of Defendant Sunset Cove Condominium Owners Association, Inc., in the amount of $37,138.80; and in favor of the Trustee for the remainder of the proceeds from the sale of the Boat Slip.

On Count II of the Trustee's Amended Complaint for preference under 11 U.S.C. § 547, Judgment will be in favor of Defendant Sunset Cove Condominium Owners Association, Inc.

On Count III of the Amended Complaint for declaratory judgment pursuant to 11 U.S.C. § 544, Judgment will be entered in favor of the Plaintiff-Trustee, and against Defendants Lewis Rauch; Carol L. Rauch; and D.SC.N., Inc. Rauch Capital LLC.

On Count IV of the Complaint for willful violation of the automatic stay, Judgment will be entered in favor of Defendant Sunset Cove Condominium Owners Association, Inc.

On the Cross-Claim by Lewis Rauch; Carol L. Rauch; and D.SC.N., Inc. Rauch Capital LLC. against Gail Fredrick and Sunset Cove Condominium Owner's Association, Inc. (Doc. No. 16), Judgment will be entered in favor of Gail Frederick and Sunset Cove Condominium Owner's Association, Inc.

On the Counterclaim by Lewis Rauch; Carol L. Rauch; and D.SC.N., Inc. Rauch Capital LLC. against the Trustee (Doc. No. 16), Judgment will be entered in favor of the Trustee.

The Debtor's Motion Requesting Sunset Cove HOA to Restore Water to Unit and Grant Damages will be DENIED.

Orders in accordance with this Memorandum Opinion will be entered this same date.

Dated: 1/26/2016                                   /s/ Arthur B. Federman
                                                    Bankruptcy Judge